[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: HEARINGS IN DAMAGES 
LAW
This case comes to this court as a wrongful death action pursuant to Statutes. The case was on the hearings in damages list as a result of a default entered against the defendant pursuant to Practice Book §§ 367 and following. The issue before the court at the hearings in damages was only the issue of damages and not the issue of responsibility. Under Practice Book § 367 and following, the defendant was precluded from offering evidence to contradict any allegations in the plaintiff's complaint except such as relate to the amount of damages.
At common law a right of action by a person who was killed or died terminated with the death. In order to remedy that harsh rule, wrongful death statutes were passed. The current Statute is § 52-555 which reads in relevant part: "In any action surviving to or brought by an executor or administrator for injuries resulting in death, whether instantaneous or otherwise, such executor or administrator may recover from the party legally at fault for such injuries just damages together with the cost of reasonably necessary medical, hospital and nursing services, and including funeral expenses . . ." The general rule has been stated in Butler v.Steck, 146 Conn. 114, 115, 116 (1959). The court stated as follows:
 "We recapitulate from these cases the elements which enter into an award of damages for wrongful death. CT Page 5261-LLLLLLLLL Damages for wrongful death, as such, are allowed as compensation for the destruction of the decedent's capacity to carry on life's activities, including his capacity to earn money, as he would have if he had not been killed . . . In the case of one who is gainfully employed . . ., the destruction of earning capacity may well be the principal element of recovery . . . But damages . . . are not restricted to those arising from the mere destruction of earning capacity. Some damages are recoverable for death itself, even though instantaneous . . ."
In Floyd v. Fruit Industries. Inc., 144 Conn. 659, 676 (1957) the court determined that if death is not instantaneous, the award may include an allowance for pain and suffering.
In Reynolds v. Maisto, 113 Conn. 405, 406 (1932) the case held that there are special damages enumerated in the statute which provide for reasonably necessary medical, hospital and nursing services and . . . funeral expenses.
FACTS
John E. Peters was sixty-two years of age on the date of his death. He was intentionally shot to death by the defendant in his swimming pool on August 5, 1993, his birthday. No one should have to die on their birthday.
Mr. Peters married his sweetheart, his present wife Katrina Peters in 1957 when he proposed to her by letter. He was the father of four children and at the time of his death he had one grandchild. He missed his two daughters weddings which took place after he died. He did not see his two grandchildren that were born after his death.
He was involved in his community. He was involved with Pathway Houses, homes for the chronically mentally ill. He took two Irish boys for 5 or 6 weeks in the summer which he called "his sons of summer" for several years. He was interested in them and taught them how to swim and tried to make them more tolerant of other religions. He was on the business council of Miami University, his alma mater for five or six years. He was a pilot who was instrument rated and he had his own plane. He even flew gliders. He loved scuba diving and did it for ten or fifteen years. He went diving in the Pacific. He belonged to the Stanwich CT Page 5261-MMMMMMMMM Club in Greenwich, where he played tennis. He loved to read. He read lots of materials concerning flying and read at least a book a week in addition to his two or three newspapers per day.
His main interest was his family. He loved having his children around. He didn't throw lavish parties since he saw people at work and just enjoyed having his family around him. He was "a family man." He spent a lot of time with his first grandchild. It was usual for him to take the entire family to St. Croix at Christmas time. His wife testified that he didn't have a lot of friends because he had turned so much to family, and that was where his enjoyment was. Both his daughters would walk down the wedding aisle with their brothers since he was absent due to his death.
Detective Thomas McCue testified and introduced the police report (plaintiff's Exhibit 1) the statement of Andrew Wilson which states in relevant part:
"Approximately four days ago I purchased a SW 9mm blued semi-automatic handgun at Chris' Gun Shop in East Haven, Ct. I also purchased two clips and Remmington 9mm hollow point cartridges. I purchased the gun to defend the Wilson family honor against what Dirk and Jack did to me.
At about 2:30 PM today, 8/5/93, I decided to shoot and kill Jack Peters. At this time I drove to Greenwich from my home in Madison, CT. I stopped at Putnam Avenue Cemetery and visited my mother's grave. While there I threw away a Saratoga, N.Y. racing form in a nearby garbage can. I apologized to mom at this time for what I was going to do.
I then walked to Peters home on Ridgeview Ave. and located Jack Peters swimming in his pool. I had carried the 9mm in a brown paper bag but disposed of the bag somewhere in Peters' driveway.
Jack Peters and I talked for several minutes. I asked him why he ever got involved with methamphetamine's and he replied "I don't know." I had the gun in my hand during the conversation. At this point I knew it was time to shoot Jack and try to kill him.
I pointed the gun at him with two hands and emptied a CT Page 5261-NNNNNNNNN clip firing the gun at him. There may have been a round left in the first clip. I saw that he was injured and bleeding and that he was trying to swim away.
I loaded another clip into the gun and commenced firing at Jack, maybe three more shots. I saw that Jack was seriously injured but still moving feebly his arms in an attempt to swim.
I walked back to the cemetery, got in my 1968 Buick Electra convertible, red, and drove by Greenwich High School for old times sake. I then drove to Greenwich Police Headquarters and told the officers at the complaint desk what I had done.
It should be mentioned that prior to leaving my home in Madison, I called Dirk Peters at his Citi Bank, New York City office and left a message on his voice mail. I said, "I hope it was worth it" and then hung up.
It is clear from the defendant's own recitation of the facts, that John Peters did not die immediately. He saw him injured and bleeding and swimming away. He then loaded the gun and fired more shots and saw him still feebly moving his arms in an attempt to swim. It is clear that death was not instantaneous and that there was pain and suffering associated with this death.
It is clear from the documents on file including the settlement cooperation agreement (defendant's Exhibit B), the letter of March 5, 1986 from J. Walter Thompson (Exhibit #2), the employment agreement with Kiptree Limited (Exhibit #3) and the tax returns (Exhibit #'s 7, 8, 9, 10 and 11) showed his earning capacity. He had been with J. Walter Thompson approximately 31 years then he became involved with Kiptree and terminated with Kiptree in June of 1993. He wanted to go back to work to J. Walter Thompson but primarily he wanted to go back to work someplace. He didn't want to be unemployed.
The expert witness Arthur W. Wright an Economist from the University of Connecticut testified. He testified within the standard of Floyd v. Fruit Industries, Inc., supra, which indicates that in measuring the compensation for the destruction of earning capacity over the probable lifetime, any savings in income tax liability should be considered as well as savings of the personal living expenses that the deceased would have incurred during the CT Page 5261-OOOOOOOOO probable duration of his life under the particular standard of living. Exhibit 13 came in as a full Exhibit and it showed the loss of earning capacity of John E. Peters was $1,702,072.00. His life expectancy was 79.6 years and that would retire at age 70.
His life expectancy therefore was 17.6 years. Introduced into evidence was Exhibit #4, the death expenses that totaled $7,176.82.
John Peters lived a glorious life. He was a husband, a father, a grandfather, a pilot, a friend, a volunteer, a valuable employee, and a club member. He had spent the morning taking his family and his two "sons of summer" to the Bronx Zoo to celebrate his birthday. A man of his wealth and stature doing a common everyday family activity. The day was capped-off with a swim in the pool while his wife went to get extra chicken and ice cream for the gathering back at the house of the family later on. In a brutal murder he was killed and suffered as he swam away from his assailant and died on his birthday.
The court awards economic damages as follows:
1. 1.7 million dollars for lost earning capacity.
2. Funeral expenses as follows: Fred Knapp Funeral Home, $1,458.00; Rudy's Limousine, $629.64; Plot $1,000.00; opening of Plot, $200.00; Church, $350.00; Headstone, $3,539.18; a total of $7,176.82.
The court finds the defendant's conduct wilful and malicious and awards punitive damages.
Punitive damages, in Connecticut are limited to the attorney's fees as set forth on Exhibit #12, $10,697.00 less taxable costs in the approximate sum of $500.00 for a net amount of $10,197.00.
The court awards non-economic damages.
Non-economic damages under General Statutes § 52-555 includes the items set forth therein and addresses the standard of "just damages". The court finds just damages in the sum of $4,600,000.00.
The total damages awarded in this case are $6,317,373.82.
So Ordered.
Dated at Stamford, Connecticut this 23rd day of August, 1996.
KARAZIN, J. CT Page 5262